JOHN V. FARWELL, Appellant, v. THE DES MOINES BRICK MANUFACTURING COMPANY, KING & KENNEDY, and THE CITY OF DES MOINES.

**Estoppel.** A grantee, who takes land, charged with actual knowledge of assessments thereon, cannot complain of their injustice.

**Statutes: REPEAL** The provisions of a statute, which makes the owner of land personally liable for assessments for improvements are not repealed by subsequent statutes respecting the lien of such assessments, which make no special provision for personal liability.

**Practice.** Where one who brings action to set assessments for local improvements aside, offers therein to pay all legal assessments, a personal judgment against him for assessments, is warranted, aside from statute.

**Delivery.** The presumption that a deed was delivered when made, is not overcome by the fact that the parties resided in different places, especially where the property was worth many thousand dollars.

**Taxation:** CONSTRUCTION OF STATUTE. Special assessments for curbing are not taxes or assessments within the meaning of a statute which exempts land used for agricultural purposes from taxation "for any city purposes."

**Exemptions:** CONSTRUCTION OF STATUTE. *Taxes*. A mere temporary occupancy and use of land for agricultural purposes, when purchased for speculation, with intent to lay it out into lots and sell them, is not a good faith occupancy and use for agricultural purposes, within the meaning of an exemption from taxation for city purposes.

*Appeal from Polk District Court—*HON. S. F. BALLIET, Judge.

TUESDAY, FEBRUARY 11, 1896.

ACTION in equity, to set aside certain curbing and paving assessments, and the certificates issued thereon. Decree for defendants, and plaintiff appeals.—*Affirmed.*

*Barcroft & McCaughan* and *Gatch, Connor & Weaver* for appellant.

*Guernsey & Bailey, Cummins & Wright,* and *J. K. Macomber* for appellees.

KINNE, J.—I. Prior to 1885, John A. Elliot owned the north fractional half of section 1, in township 78, range 24, west fifth P. M. Thereafter, the state fair grounds were located east of the city of Des Moines, and, for the purpose of affording ready access to the same, the board of supervisors, of Polk county, in 1885, established Grand avenue, as a consent road, one hundred and sixty feet wide, through said land. Several parcels of this land were platted by Elliot, and others, as additions to the city, and the balance

was, in the fall of 1885, conveyed to J. W. McCabe, who, about three years later, conveyed it to L. S. McCabe, and he, in turn, by deed, dated May 19, 1893, and which was filed for record on June 17, 1893, conveyed this land, consisting of about ninety-five acres, to the plaintiff, Farwell. In this deed was the following provision: "It is expressly understood that the grantor herein excepts, from the covenant of warranty, and against incumbrances, judgment and mortgage liens, accrued interest thereon, the tax of 1892, and the curbing tax—in all, not exceeding $5,300; also, excepting taxes for 1893, and claim or lien for paving." In 1888, two parcels of the land, situated near the center of the tract, bought by McCabe, were conveyed to Crosswaits. By the provisions of chapter 1, of the acts of the Twenty-third General Assembly, which took effect, by publication, on March 14, 1890, the corporate limits of the city of Des Moines were extended, and its territory increased to fifty-four square miles. It had formerly embraced only eight square miles. This act is commonly known as the "Annexation Act." At the time this act took effect, McCabe owned this ninety-five acres of land. In 1891, the city council ordered Grand avenue improved, by paving and curbing, and the work was done, and the cost assessed against the adjacent land. The work had been completed, prior to the time plaintiff purchased the land, but the cost of it had not then been assessed. The amount of these assessments, as fixed in the decree of the district court, and, including interest and collection fees, is sixteen thousand, eight hundred and twenty-two dollars, and seventy-five cents, of which sum two thousand, eighty-eight dollars, and fifty cents, was for curbing, and fourteen thousand, seven hundred and thirty-four dollars, and twenty-five cents, was for paving. The street thus improved, runs east and west, through the plaintiff's

land. Plaintiff claims that, under the law, this land was not liable for the cost of making these improvements, and brings this action to cancel said assessments, and the certificates issued in pursuance thereof; and, at the same time, he tendered and offered to pay "any and all legal assessments of taxes, for city or other purposes, upon said land, or for which said land may be legally liable." In this action, the contractors for the improvements were made defendants. These contractors filed counterclaims based upon the assessment certificates, upon which judgments were entered in their favor. A personal judgment was also, in effect, ordered against the plaintiff for the amount of the special assessment for paving, and plaintiff's bill was dismissed, and he appeals.

II. The annexation act, heretofore spoken of, and by virtue of which the land now owned by the plaintiff, was incorporated into the city of Des Moines, contained the following provisions: "Sec. 3. No lands included within said extended limits of such city, which shall not have been laid off into lots of ten acres or less, or which shall not subsequently be divided into parcels of ten acres or less, by the extension of streets and alleys, or otherwise, and which shall also in good faith be occupied and used for agricultural or horticultural purposes, shall be taxable for any city purpose, except that they may be subjected to a road tax to the same extent as though they were outside the said extended limits, and which road tax shall be paid into the city treasury." Acts Twenty-third General Assembly, chapter 1. The first question for consideration is, has the land in controversy been, in good faith, occupied and used for agricultural or horticultural purposes, within the meaning of the statute? That it has been, in fact, used for agricultural purposes, and so occupied, is so

fully established as to need no further consideration. The contention is, that the occupancy and use have not been, in good faith, for agricultural purposes. Now, what is meant by a good-faith use and occupancy for the purposes mentioned? Manifestly, it means something more than mere actual occupancy and use for the purpose mentioned; else there would have been no occasion for the use of the words "in good faith." The occupancy and use must be in good faith. So, if the plaintiff acquired title to this land for purposes of speculation, with the intention of laying it out into lots, and selling the same, an occupancy or use of the land, temporarily, for farming purposes, would not be in good faith, for such purposes, within the contemplation of the statute. If, however, his main purpose in making the purchase of this land was to use it for ordinary agricultural purposes, and so far it has been thus used and occupied, then we should say such use and occupancy had been, and was, in good faith. It becomes, then, a question of the intent of the owner, which must be gathered from what he has done and said, if anything; from the circumstances surrounding the purchase; the amount paid, in view of what might reasonably be expected to be realized from its use for agricultural purposes; and other facts and circumstances which may go to show the situation, surroundings, and peculiar adaptability of the property for certain purposes or uses, and tending to show the purpose for which it was purchased and is held. Hence, a mere temporary occupation and use for agricultural purposes, until such time as the real object of the purchase can be attained, would not be a good-faith occupancy and use, within the contemplation of the statute. In the light of the above suggestions, we turn to the record, to discover, if possible, the intent with which this land was purchased and is held by the plaintiff. When Grand avenue was laid out through

this land, there was left about five and one-half acres of the land south of the highway, and about ninety-five acres north of it. Before the highway was established, the entire tract had been fenced in one field. The tract north of Grand avenue is about one thousand seven hundred and fifty feet north and south, and about one thousand eight hundred and eighty-seven feet in length. The other tract varies in depth from one hundred and fifty-five, to one hundred and fifty-seven feet, and extends along the street for a distance of one thousand five hundred and six feet. When the highway was laid out, in 1886, it was done at the instance of the then owners of this land. The only buildings then on the land consisted of a house and barn. McCabe, who bought this land in 1885, clearly shows, by his testimony, that he did not purchase it with a view to its use or value for purposes of agriculture. He says: "I bought it because I believed it was valuable for some other purpose than to be used agriculturally. I thought it could be used for platting purposes, or cropping purposes, or some other purpose, because it was adjacent to the city. I did not buy it because it was good agricultural land, and could be used for that purpose. I bought it because it was close to Des Moines." He claims, however, that in his absence, and without his authority, his agent caused this land to be platted. He says, "I did not record it, because we did not consider it good policy to do it. We were not ready to sell the lots, and I did not record it." He kept the land about three years, and then sold it to his brother, for three hundred dollars per acre, the same price he had paid for it. Now, if this man still held this land, it would hardly be claimed that he occupied and used it in good faith for agricultural purposes. It is true that the intention with which he purchased and held it, is not determinative of the

character of the purchase and holding of the plaintiff, but it is proper to be considered, as showing the history of the land, how it had been treated and held by owners prior to the plaintiff. Now, what was plaintiff's intention as to this land? He paid about six hundred dollars per acre for it. True, he traded a stock farm for it, but it is conceded that the actual consideration was from fifty thousand dollars to sixty thousand dollars. We do not think that Farwell should be bound by Harding's testimony as to his (Farwell's) intent, for it appears that Harding was the agent for the seller in the negotiations which led up to the trade. Now, it is clear that Farwell would not make such a purchase without expecting to realize a profit out of the transaction. We think, also, it should be presumed that Farwell knew all of the facts touching this land, which were matters of public notoriety, as well as those matters which appeared of record. He knew, then, that the land, for agricultural purposes, would pay practically nothing upon the amount he had invested therein. He knew of its favorable location for the purpose of being platted and sold as city lots. He must be presumed to have known, what the records showed, that this tract was bounded on all sides, except on the south, by laid-out streets, and on the south by an alley; that numerous streets abutted upon it; that lying near it on the north, were the platted additions of Fairview and Hyde Park; that east and southeast of it, were platted additions, also the fair grounds; that south, southwest, west, and northwest of it, the ground was nearly all laid out into lots and blocks, and platted. In other words, for half a mile north and east, and for miles south and west, of this land, substantially the whole territory is subdivided into city lots, blocks, streets, and alleys. On Walnut street, only a block and a half south of

this land, is a line of electric railway, extending from the fair grounds to the center of the city, and on the same street, and other streets in the vicinity, are water mains and public lights. Near by are public schools. The territory in the vicinity of this land—especially south, southwest, and southeast of it—is much occupied by dwellings, stores and factories. As appears by his deed, he had actual knowledge, when he made his purchase, that Grand avenue had been curbed and paved through this land. He knew that such improvements were not ordinarily made through purely agricultural land, and, as well, knew that such improvements would only enhance the value of the land when utilized for city purposes. We think the facts are such as to warrant the conclusion that plaintiff did not purchase this land with the intention of thereafter devoting it to agricultural uses, but such use was a mere temporary incident of the purchase, and to be continued until the land could be made available for the real use for which he acquired it, viz., selling it, in small tracts, for urban purposes. It is said in *Fulton v. City of Davenport*, 17 Iowa, 404, "Difficult as the task will be, it is apparent that every such case will have to be determined upon its own peculiar circumstances, without regard to any definite or fixed rule, and herein, doubtless, the decision in some instances will appear quite arbitrary, and, perhaps, unsatisfactory." In *Brooks v. Polk County*, 52 Iowa, 460 (3 N. W. Rep. 494), it is said, "Indeed, adjudicated cases aid but little in the determination of questions of this character, when no two cases can be found precisely similar in their facts." It may be profitable, however, to notice briefly some of our decisions relating to the liability of farm property to municipal taxation. In 1876, the legislature passed an act authorizing cities to extend their limits. It contains a section, in substance identical

in language with section 3, of the annexation act, Acts Sixteenth General Assembly, chapter 47. Several cases have arisen and been determined since that act was passed. Not all of them, however, arose under the act. In *Brooks v. Polk County, supra*, the question as to the taxation of land for municipal purposes arose as to land originally included within the city limits. That case, as to the actual use of the land and its surroundings, is much like the one at bar. The rule laid down in *Fulton's Case*, that "when the proprietors of undivided town property, being locally within the corporate limits, hold such close proximity to the settled and improved parts of the town that the corporate authorities cannot open and improve its streets and alleys, and extend to the inhabitants thereof its usual police regulations and advantages, without incidentally benefiting such proprietors in their personal privileges and accommodations, or in the enhancement of their property, then the power to tax the same arises," was approved, and it was held that the property was taxable. In *Winzer v. City of Burlington*, 68 Iowa, 279 (27 N. W. Rep. 241), a case which arose under the act of the Sixteenth General Assembly, it appeared that the land had been used and occupied for agricultural purposes, and that it was not held for speculative purposes, and it did not appear that it was adapted to be subdivided into lots. It was held that its use, under such circumstances, was in good faith under the statute. In *Tubbesing v. City of Burlington*, 68 Iowa, 691 (24 N. W. Rep. 514), (28 N. W. Rep. 19), a case not arising under the act of the Sixteenth General Assembly, the *Brooks Case* was followed. In *Leicht v. City of Burlington*, 73 Iowa, 29 (34 N. W. Rep. 494), in which was involved the constitutionality of the act of the Sixteenth General Assembly, it was said that "the design of the legislature evidently was

to exempt property which is used essentially for agricultural purposes." *Perkins v. City of Burlington*, 77 Iowa, 554 (42 N. W. Rep. 441), followed the *Brooks Case*. In no case, however, has the meaning of the words "in good faith," as used in the statute, been fully considered. Counsel for appellant contend that the legislature, by the provisions of the annexation act, intended to extend the exemption which the courts had recognized prior to the passage of the act of the Sixteenth General Assembly. We do not think that is correct. The fact is that the act of the Sixteenth General Assembly, as well as the section of the annexation act under consideration, narrows the former rule as to exemptions, by creating additional tests by which the right to the exemption is to be determined. It will serve no useful purpose to discuss all of the cases decided by this court, wherein the right of a municipal corporation to tax what was claimed as farm land has been considered. So far as they can be said to be applicable to the question before us, they sustain the conclusions which we have reached. *Morford v. Unger*, 8 Iowa, 82; *Butler v. Muscatine*, 11 Iowa, 433; *Langworthy v. Dubuque*, 13 Iowa, 86, 16 Iowa, 271; *Davis v. Dubuque*, 20 Iowa, 458; *Buell v. Ball*, 20 Iowa, 282; *Hershey v. Muscatine*, 22 Iowa, 184; *Deeds v. Sanborn*, 22 Iowa, 214, 26 Iowa, 419; *O'Hare v. Dubuque*, 22 Iowa, 144; *Deiman v. Ft. Madison*, 30 Iowa, 542; *Durant v. Kauffman*, 34 Iowa, 194.

III. Is a special assessment for paving or curbing a street, taxation for "any city purpose," within the meaning of section 3, of the annexation act? Appellant contends that this court has so recognized it. It is true, that in *Sears v. Railway Co.*, 39 Iowa, 417, a sewer is, by way of argument, included in the list of objects for which a municipal tax may be levied. No doubt, the writer had in mind section 465, of the Code of 1873, which

authorized cities to construct sewers, and pay for the
same out of the general fund. It is said that in
*Warren v. Henly*, 31 Iowa, 31, the doctrine is recognized that special assessments for the improvement of
streets, are to be deemed taxes for city purposes. We
do not think that case is properly open to the contention that it holds such special assessments are in
the nature of general corporate taxes. In *Tuttle v.
Polk*, 84 Iowa, 12 (50 N. W. Rep. 38), in considering an
act of the legislature, wherein a special assessment is
also spoken of as a tax, it is said: "It is well
to remember that a special assessment for street
improvements, is now regarded everywhere as a tax,
and subject to the same rules, in many respects, as
ordinary taxation for revenue." And an assessment,
denominated by statute as a "special tax," is covered
by an agreement in a lease "to pay all taxes." *Cassady v. Hammer*, 62 Iowa, 358 (17 N. W. Rep. 588). In
the same case, however, the court says: "We are
aware that it has been held, that a statute providing
for the exemption of a certain class of property from
taxation, does not exempt from assessment for local
improvements. An exemption from taxation
being an exception, it is strictly construed."
Whether the sum to be raised, to pay for curbing and paving a street, and which is assessed against
the property of the adjacent owner, be called a special
assessment or a tax, is not very material, for the purposes of this inquiry. The question is, is it to be
treated, under this statute, as a tax "for any city purpose?" That it is a tax, in the sense that the right to
impose such a burden is based upon the power of taxation, there is no doubt. But that it should be so
treated in a statute which exempts certain property
from taxation "for any city purpose," is quite another
question. No doubt, some confusion has arisen from
the use of the words "tax," a "special tax," and a

"special assessment," in various cases, to indicate the same thing.  Section 495, of the Code of 1873, requires the city council to certify to the auditor, the percentage of "tax levied for all city purposes," which "tax, for municipal purposes," the county treasurer is to collect and pay over to the city.  Section 496, limits the amount thus certified, assessed, and collected, for all general and incidental purposes, to ten mills on the dollar.  Now, if special assessments for curbing and paving are to be deemed "taxes for all city purposes," it would follow that the entire amount of general taxes and special assessments to which property could be subjected, would be ten mills on the dollar, and that it must all be collected by the county treasurer, nor could such special assessments be transferred by the city to others.  That the "tax for all city purposes" does not include special assessments, is clear, because, by section 466, the city is given the power to pave and curb streets, and to levy a special tax therefor upon the abutting property, and this assessment it may assign to the contractor.  Code, section 478.  And it may collect it by proceedings in court.  Code, sections 478, 479.  Or it may certify it to the auditor for collection by the county treasurer.  Code, section 481. It being then, clear that the words used in the Code, "tax levied for all city purposes," do not include special assessments, why should we say that the words, "taxable for any city purpose," in the annexation act, should be held to include special assessments?  The language of the Code is as broad as that of the act referred to.  Taxation is the rule, and exemption the exception; therefore, strict construction of the statute under which the exemption is claimed is also the rule.  *Sioux City v. Independent School District of Sioux City*, 55 Iowa, 152 (7 N. W. Rep. 488); *Cassady v. Hammer, supra; Dunlieth & D. Bridge Co. v. Dubuque*, 32 Iowa, 427.  It was held in the

case first above cited that a provision that the
property of a school district is "not to be taxed,"
will not exempt such property from a special assess-
ment, unless, from the entire statute, it is clear that
such was the legislative intent.   A brief reference to
cases from other states may be profitable.   It is the
almost universal rule that a general exemption from
taxation will not extend to, and embrace, special
assessments.   Cooley, Taxation, page 207; 2 Desty,
Tax'n. 1248, 1249; Welty, Asse'm., sections 169, 170;
25 Am. and Eng. Enc. Law, 160, 495; 2 Dillon, Mun.
Corp. sections 777, 778; 2 Beach, Pub. Corp. sections
1172, 1173; Burrows, Tax'n. page 461; Elliott, Roads
and S. 370.   In the following cases, the language
quoted was held not to include assessments for local
improvements:   "Taxed by any law of the state," *In
re Mayor, etc., of New York*, 11 Johns. 77; "All public
taxes, rates, and assessments," *Buffalo City Cemetery
v. Buffalo*, 46 N. Y. 506; "All and every county, road,
city, and school tax," *Northern Liberties v. St. John's
Church*, 13 Pa. St. 107; "Exempt from taxation of
every description," *Canal Trustees v. City of Chicago*,
12 Ill. 403; "Exempt from all taxation, by state or local
laws, for any purpose whatever," *Zabel v. Louisville
Baptist Orphans' Home* (Ky. App.) (17 S. W. Rep. 212);
"Taxes, charges and impositions," *President, etc., of
Paterson v. Society for Establishing Useful Manufac-
tures*, 24 N. J. Law, 385; "Charges and impositions,"
*State v. Mayor, etc., of Newark*, 27 N. J. Law, 185;
"Any tax, or public imposition whatever," *Mayor, etc.,
of Baltimore v. Proprietors of Green Mountain Cemetery
Co.*, 7 Md. 517; "A tax on franchises, in lieu of all
other taxes," *Bridgeport v. New York & N. H. R. Co.*,
36 Conn. 255; "All taxes, either by state, parish, or
city," *City of Lafayette v. Male Orphan Asylum*, 4 La.
Ann. 1; "Taxation of every kind," *Sheehan v. Hospital*,
50 Mo. 155; "Exempt from taxation," *Boston Seaman's*

*Friend Soc. v. Boston*, 116 Mass. 181; *Roosevelt Hospital v. Mayor, etc., of New York*, 84 N. Y. 108; "Taxes of every kind," *Illinois Cent. R. Co. v. City of Decatur*, 126 Ill. 92 (18 N. E. Rep. 315); "All taxation," *Winona & St. P. R. Co. v. City of Watertown* (S. D.), (44 N. W. Rep. 1072). See, also, *Worcester Agricultural Soc. v. Worcester*, 116 Mass. 189; *Hassan v. City of Rochester*, 67 N. Y. 528. In view of the above, and many more authorities which might be cited, we think there can be no doubt that the clause in the act under consideration does not exempt plaintiff's property from these special assessments, for curbing and paving. While all such assessments are, in a sense, taxes, they are in no proper sense taxes, or special assessments "for any city purpose." While it is true, that all citizens of the city may use these improvements, and hence may be said to be, to such extent, benefited by them, and while the benefits derived from them do not all attach to the adjacent property, still, they are not treated by our law as taxes for strictly city purposes. The taxes referred to in the act, are what we speak of as general corporation taxes—that is, burdens imposed upon all property, and property owners, for general corporation purposes. These burdens, which plaintiff seeks to escape, are not such as are imposed for general corporation purposes. They are special, and local in character. They may exist in one part of the city, and never be imposed in another part.

IV. Is plaintiff personally liable for the amount of the paving assessment? Many reasons are urged to show that he should not be held so liable. It is said that there is nothing to show that plaintiff was the owner of the property when the assessment was made. Farwell filed his deed for record June 17, 1893. It was executed May 19, 1893. It is hardly necessary to cite authorities to the effect that the presumption is, in the absence of evidence

to the contrary, that this deed was delivered when it was made. It is not enough, to overcome such presumption, to show that Farwell resided in Chicago, and the grantor in Rock Island. It is not to be presumed that, in a deal involving property worth from sixty to ninety thousand dollars, the purchaser was not represented at Rock Island, either in person, or by some one authorized to act for him. In law, then, we must assume that the deed was delivered on the nineteenth day of May, 1893. The act of the council in making the assessment occurred on June 12, 1893. All other acts which led up to this assessment were preliminary. It is said that there was no ordinance of the city making the land owner personally liable for such assessments. The personal liability is created by the statute. It provides: "Such charge, when assessed, shall be payable by the owners at the time of the assessment personally, and shall also be a lien upon the respective lots, or parcels of land, from the time of the assessment." Code, section 478. It is claimed that this statute has been repealed. Reliance is placed upon section 13, of chapter 168, of the Acts of the Twenty-first General Assembly. It provides: "Said assessments, with interest accruing thereon, shall be a lien upon the property abutting upon the street, or streets, on which any such improvement is made, from the commencement of the work, and shall remain a lien until fully paid * * *: Provided that such lien shall be limited to the lots bounding, or abutting, on such street, or streets, and not exceeding in depth therefrom one hundred and fifty feet." A similar provision is found in the Acts of the Twenty-third General Assembly (chapter 14, section 12). Section 17, of the same act, provides that "any owner of any lot, or lots * * * assessed for payment of costs of any such improvement, who will not promise, or agree, in writing, as

provided in section 16 hereof, shall be required to pay his assessment in full when made, and the same shall be collectible by or through any of the methods provided by law for the collection of assessments for local improvements, including the provisions of this act." Similar provisions are found in section 18, of chapter 168, Acts of the Twenty-first General Assembly. The claim is made that, as in these acts subsequent to the Code no express provision is made for personal liability, therefore the provision of the Code is repealed, by implication. We fail to find in these subsequent acts anything repugnant to the provision of the Code which makes the land owner personally liable for such assessments. It seems to us these subsequent provisions are perfectly consistent with the intent to preserve a personal liability against the owner.

V. The decree in this case provides that, after a sale of that part of this land subject to the assessment, a general execution may issue against the plaintiff for the balance remaining unpaid. It is contended that, if the statute authorizes such a decree, it is in conflict with the second clause of section 1, of article 14, of the constitution of the United States. We do not find it necessary to determine that question. Plaintiff, in his petition filed in this action, made the following tender: "Plaintiff says that he is willing, and hereby offers to pay any and all legal assessments of taxes, for city or other purposes, upon said land, for which said land may be legally assessed." Now, we find that the assessment was legal,—that the land was liable for these local improvements. If plaintiff's offer means anything, it is a proposition to pay these assessments. It is, in effect, a tender and offer to pay whatever may be adjudged legally assessable against the land. Such an offer justified a personal judgment for the amount

found to be due, regardless of the statute providing for a personal liability.    *Corbin v. Woodbine*, 33 Iowa, 287.

VI.    Several other objections are made to these assessments.    We have examined all of them, and discover no such irregularity in the proceedings as justifies us in disturbing the decree rendered by the district court.    It is claimed that to impose the burden of these assessments upon plaintiff and his land, will work a great injustice.    The imposition of burdens for local improvements, not infrequently results in a practical confiscation of the property sought to be benefited.    Nevertheless, such improvements are necessary.    In this case, however, plaintiff, by the very terms of his deed, took this land, charged with actual knowledge of these assessments, and was bound to know that they were a charge upon this property.    He was not deceived. Whatever injustice there is in the practical effect of laws which permit such improvements to be made, and the cost thereof to be liens upon the abutting property, plaintiff is in no situation to complain, as he assumed voluntarily the very burdens, which, in this proceeding, he is seeking to avoid.    After a careful consideration of all the questions raised, we conclude that the decree below should be AFFIRMED.